Carolyn **BENNETT**

v.

**VETERANS ADMINISTRATION MEDICAL CENTER and Veterans Administration, et al.**

**Civ. A. No. 87–7482.**

United States District Court, E.D. Pennsylvania.

Dec. 28, 1988.

---

**724**

Rosemarie Rhodes, Harper & Paul, Philadelphia, Pa., for plaintiff.

Joanna Jacobs and Lois Davis, Asst. U.S. Attys., U.S. Attorney's Office, Philadelphia, Pa., for defendants.

FINDINGS OF FACT,
CONCLUSIONS OF LAW

DISCUSSION AND ORDER

VANARTSDALEN, Senior District Judge.

*Findings of Fact*

1. Plaintiff, Carolyn Bennett is a black female. She is employed at the Veterans Administration Medical Center in Philadelphia, Pennsylvania (VAMC). She has a civil service grade of GS–5, and her job classification is a purchasing agent in the Prosthetics Service. The Veterans Administration is the employing agency.

2. Plaintiff commenced government civil service in June of 1974 as a clerk-typist with the Internal Revenue Service. Her entry level was GS–3.

3. In August, 1976, plaintiff was employed as a clerk-typist at VAMC in the Medical Administrative Services. Her job duties included interviewing and screening patients and families of patients to determine patient eligibility for various veterans' medical services and benefits.

4. In August, 1978, plaintiff was promoted to the position of Clinic Clerk, GS–4. This position was also in Medical Administrative Services, and her job duties included explaining to patients the doctors' orders and setting up appointments for patients

for various other services, such as EKG. Plaintiff held this position from August 1978 to April, 1979.

5. In April, 1979, plaintiff was promoted to the position of Correspondence Clerk, GS–5, in the Medical Administrative Services. Her job duties included handling patients' requests for release of information to private doctors, lawyers, insurance companies and social security; she was also responsible for contacting these outside sources on patients' behalf.

6. Plaintiff remained a GS–5 correspondence clerk until April of 1982. For personal family reasons she transferred for a period of time to a medical facility of the Veterans Administration in Ohio, and then later transferred back to VAMC. In order to affectuate these transfers she accepted a reduction in grade to GS–4 as a clerk-typist in Prosthetic Services as of April 1982, and held that position until November 1985. Her job duties included handling patients' requests for the receipt and repair of certain prosthetic devices. Plaintiff had direct contact with patients, medical personnel and sellers of prosthetics in carrying out her duties.

7. In November, 1985, plaintiff was promoted to her present position of Purchasing Agent in Prosthetic Services, GS–5. Her job responsibilities include the allocation and monitoring of five clerks and a quarterly budget of over $200,000 for the acquisition of prosthetics. She deals daily with patients and vendors; she handles inquiries from family members and on rare occasions from congressional offices. Plaintiff held this position at the time she applied for the Medical Administrative Assistant (MAA) position in March, 1987.

8. Plaintiff's work experience and records establish that she worked in different areas of the Medical Administrative Services for five years and eight months, with progressively more responsible positions, although at present she is in Prosthetic Services, which is distinct and separate from Medical Administrative Services.

9. Plaintiff's position in Prosthetic Services as purchasing agent requires her to exercise some authority over the work of others and monitor their job duties.

10. Plaintiff's performance appraisal for the period ending April 28, 1986, which was the last appraisal she received prior to applying for the promotion to MAA rated her performance "highly satisfactory", although this was entered only after some disagreement between her and Ms. Joyce Mantel, the Associate Director, followed by a grievance review. *See* Exhibit P–1–C(10).

11. In January 1987, VAMC posted a "1987 Open Continuous Vacancy Announcement." Among the long list of potential job openings was that of MAA within the Medical Administrative Services. Plaintiff filed her application for an MAA position in January, 1987. There were a total of eighteen applicants for a single MAA opening to be filled in March of 1987. Personnel Services conducted an initial screening and determined that sixteen applicants met the minimum requirements for the job. Both plaintiff and Michael Menzen, the person ultimately selected for the job, were among the sixteen qualified applicants. A rating panel was then convened for the purpose of referring a limited number of qualified applicants to the selecting officials. The panel was composed of six black females, two of whom were Medical Administrative Assistants. The panel reviewed the applications and records without identification of the applicants by race, and referred to the selecting officials eight persons whom the panel determined were the most highly qualified for the job.

12. Both plaintiff and Michael Menzen were referred by the panel to the selecting officials. Of the eight thus referred, one was a white male, one was an hispanic male and six were black females. One of the black females withdrew her application. The panel gave Michael Menzen and plaintiff the same numerical score in making the reference to the selecting officials. The panel performed its duties fairly, properly and in accordance with applicable regulations and procedures.

13. Patrick Appignani was Chief of the Medical Administrative Services. The selection of a person to fill the MAA position

ordinarily would have been made by Patricia Weigand, the Assistant Chief of Medical Administrative Services. However, because she was a relatively new appointee to the position of Assistant Chief, Mr. Appignani decided that the selection should be made after personal interviews of the candidates conducted jointly by himself and Ms. Weigand. Regulations do not require interviews, but where interviews are held, all candidates must be interviewed. Both Mr. Appignani and Ms. Weigand are white.

14. Michael Menzen commenced work at VAMC in 1978 as a clerk GS–3. He had previously served about 4 years in the Navy as a disbursing clerk, and also had been a civilian file clerk GS–3 for about 3 months. His services at VAMC have been with the Medical Administration Services. He progressed to clerk-typist GS–4, claims clerk GS–4/5, medical data clerk GS–5, and supervisory file clerk GS–5. The last job was an important job and he was credited by his superiors with having done a good supervisory job in what was described as a very difficult assignment. However, his last performance appraisal rated him as "fully satisfactory" a lower rating than "highly satisfactory."

15. Neither Patrick Appignani nor Patricia Weigand took any notes that were preserved of the interviews or of the questions asked or the answers given. Neither interviewer wrote the questions that were asked. Although the same general categories of questions were asked of the applicants, not all candidates were asked the same questions, and some interviews took longer than others. There was no objective method for scoring the interviews, nor of weighing the interviews against the record of the applicants as established in their respective personnel files.

16. It is customary, although not mandatory, that an applicant complete and fill out an "Employee Supplemental Qualifications Statement." The form document states in part: "This form will be the *primary source document* used to evaluate

your qualifications and to rate and rank you for a specific position. If you decline to provide the information requested, it may not be possible to evaluate your qualifications fully." Administrative Record at exhibit C–6(a)[1] (emphasis in original). Plaintiff filled out the form and filed it. Michael Menzen never provided such a form prior to his selection for the job. There is no evidence that the selecting officials considered Carolyn Bennett's statements contained in the document, or in any way questioned why Mr. Menzen did not supply the information requested in the form.

17. The Veterans Administration Position Report describes the MAA's principal duties and responsibilities in part as serving

as the principal representative of the Hospital Director and Chief, Medical Administration Service during all administrative non-working hours of the day, weekends and holidays. In this capacity, [the Medical Administrative Assistant] has been delegated complete authority and responsibility to exercise the Hospital Director's prerogatives in all medical administrative matters occurring during his tour of duty. He serves as a principal advisor to the Medical Officer of the Day having responsibility for all legal determination[s] relating to the admission and disposition of patients.

Administrative Record at exhibit C–5.

18. The position report description for MAA further provides that the incumbent would perform duties as follows:

1. Serves as coordinator of all outside contacts, personal or otherwise....

2. Approves and acts on emergency requests for services or supplies from personnel on duty. Arranges for emergency transfer of patients to other facilities providing specialized treatment ... as requested by the officer of the day....

3. Principal advisor to medical officer of the day in the interpretation of regula-

---

**1.** The "Administrative Record" is a compilation of preinvestigative materials and correspondence, affidavits and records, and documents on this matter. The Administrative Record was stipulated by both counsel and accepted into evidence by the court.

tions.... Pending arrival of professional personnel must be equipped to handle difficult situations involving patients and their relatives....

4. Processes applicants for admission, determine eligibility....

5. Handles all administrative details in connection with accidents or injuries occurring on hospital grounds....

6. Responsible for the proper care and handling of patients' funds and personal effects upon admission and disposition during his tour of duty. Coordinates all administrative details in connection with the death of patient....

*Id.*

19. According to Mr. Appignani, the principal qualifications for the MAA position are: leadership abilities, communication skill, ability to work under pressure, ability to exercise independent judgment and the ability to supervise.

20. The asserted basis for selecting Mr. Menzen was, according to both Mr. Appignani and Ms. Weigand, that he impressed them "by far" the most favorably during the interview. According to the interviewers, he was very articulate, and gave positive statements and responses, including the assertion that being an MAA had been one of his career goals. Both interviewers obtained the impression that plaintiff was defensive during her interview, answered most questions with brief "yes" or "no" type of answers, and seemed to them more interested in the money than the job.

21. Mr. Appignani had known Mr. Menzen who had worked under and with him in Medical Administrative Services at various positions. Because plaintiff had been employed in Prosthetic Services since 1982, neither he nor Ms. Weigand were personally familiar with plaintiff or her work background.

22. Mr. Menzen had a total of 8 years, 4 months "specialized experience," whereas plaintiff had only 5 years, 8 months "specialized experience." Specialized experience, for purposes of record keeping was defined as employment in Medical Administrative Services of VAMC. However, plaintiff started working for VAMC as clerk-typist in 1974 and worked continuously in various jobs at VAMC since that year, except for a period of time when she worked in Ohio at another Veterans Administration facility. Mr. Menzen, on the other hand first started working for VAMC in 1978, but had always worked in Medical Administrative Services.

23. There is no regulatory requirement that of the eight persons referred by the panel to the selecting officials, the selecting officials had to select the person "best qualified" upon any objective test basis. However, both Mr. Appignani and Ms. Weigand opined that Mr. Menzen was the best qualified based upon his favorable interview and record.

24. Upon completion of the interviews, Patricia Weigand notified Peter Sepe, Chief of Personnel Services at VAMC, that Mr. Menzen had been selected for the position of MAA to be effective March 29, 1987. Mr. Menzen was notified of his selection for the position on March 13, 1987. Personnel Services also notified all the other candidates of Mr. Menzen's selection.

25. VAMC has no review or other process to insure compliance with federal statutes and regulations that prohibit discriminatory practices in selecting and promoting employees for job openings. Neither Mr. Sepe nor anyone else at VAMC made any independent investigation, prior to Mr. Menzen's appointment as an MAA, to determine whether race or sex was a factor in his selection, or whether plaintiff or any of the other candidates were the subject of unlawful racial or sexual discrimination.

26. There is an allocation for 6 MAA positions at VAMC. There was a vacancy to be filled in March of 1987.

*Conclusions of Law*

1. Plaintiff filed this action pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–16, alleging racial and sexual discrimination against her by the defendants failure to select and promote her to the position of Medical Administrative Assistant in the Medical Administrative Services

Section of the Veterans Administration Medical Center in Philadelphia, Pennsylvania.

2. This court has subject matter jurisdiction. This court has personal jurisdiction over the parties litigant.

3. Plaintiff has exhausted all required administrative remedies and has complied with all conditions precedent to filing and maintaining this action.

■ 4. Plaintiff established at trial a prima facie case of both racial and sexual discrimination because:
a) Plaintiff is a black female;
b) Plaintiff was qualified for the position of Medical Administrative Assistant;
c) The employer VAMC, and specifically Medical Administrative Services, was seeking applicants for a job opening in the position of Medical Administrative Assistant;
d) Plaintiff, despite her qualifications, was not selected;
e) A white male, Michael Menzen was selected for the position.

■ 5. Defendant articulated as the legitimate, nondiscriminatory reasons for selecting Mr. Menzen that based on his supervisory ratings, prior job experience and personal interview he was better qualified for the job than was plaintiff and that he was the best qualified for the job among all of the applicants.

6. Defendant thus presented sufficient evidence, if accepted by the trier of fact, to rebut the plaintiff's prima facie case.

7. The reasons provided by defendant for selecting Mr. Menzen in preference to plaintiff are not the real and true reasons, and were pretextual.

8. On the basis of the entire evidence, plaintiff has sustained the ultimate burden of persuasion and has proved by a preponderance of the evidence that defendant discriminated against her on account of her race in violation of Title VII of the Civil Rights Act, § 2000e *et seq.*

9. Plaintiff is entitled to such relief as will place her in the same position she would have been in absent the violation of the Civil Rights Act. To accomplish this, she is entitled to such retroactive pay, seniority and benefits increase as she would have received had she been promoted to the MAA position as of March 29, 1987. In addition, plaintiff is entitled to be promoted to the position of Medical Administrative Assistant at VAMC as soon as the next available opening for that job occurs.

## DISCUSSION

Title VII discrimination cases are almost always difficult to decide despite the logical niceties of case law concerning establishing a prima facie case, rebutting a prima facie case and carrying the overall burden of persuasion, because the ultimate issues usually involve a determination of the subjective intent and state of mind of the person or persons who made the employment decision that is alleged to be discriminatory as to the plaintiff. Where, as here, a facially legitimate explanation for the employment decision is provided to rebut a prima facie case, the ultimate question is one of credibility. Credibility does not ordinarily lend itself to objective analysis. From past experience, I am convinced that in the vast majority of Title VII cases, by the time the case reaches trial, the person or persons responsible for the challenged employment decision are thoroughly and honestly convinced that they possessed no discriminatory intent and that race, in particular, played no part in the decision. This case appears typical in that regard.

Plaintiff clearly made out a prima facie case. She is black, a race to be protected by the law, and a female, also protected by the law. She has established that she was fully qualified for the job. The Personnel Services panel initially determined that she and fifteen other applicants met the minimum qualifications for the MAA position. Thereafter, a rating panel, whose qualification, make-up and procedures are in no way challenged or suspect, referred eight persons to the selecting officials. The referrals were designated by the panel as the eight best qualified on the basis of the records submitted, without knowledge by the panel members as to the race of any

applicant. Of the eight persons referred by the panel, Michael Menzen, the person ultimately selected for the job was the only white male. The only other male applicant referred was hispanic. The remaining six persons, including plaintiff, were all black females, one of whom withdrew her name. Thus, there was finally one white male, one hispanic male and five black females from which the selecting officials could have made their selection. The process by which the seven persons were referred and considered by the selecting officials conclusively establishes that plaintiff was qualified for the job. Defendant does not contend to the contrary. Because the white male was selected, plaintiff has thus made out a prima facie case of race and sex discrimination in the employment-promotion decision. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Defendants raised a genuine issue of fact as to whether they discriminated against plaintiff on the basis of race or sex by producing evidence that Mr. Menzen was selected in preference to plaintiff for legitimate nondiscriminatory reasons. *See Texas Dept. of Community Affairs*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95. Articulation of the reasons was produced primarily through the testimony of Mr. Appignani, the Chief of Medical Administration Services. He testified that both he and Ms. Weigand, the Assistant Chief and person who would ordinarily make the selection, considered Mr. Menzen to be the better qualified applicant because of his longer work experience in Medical Administrative Services; his proven administrative abilities in reorganizing the section's file room department; Mr. Appignani's personal knowledge of Mr. Menzen's work when a new computer system was installed; and, of foremost importance, his very impressive interview. Mr. Appignani expressed the opinion that plaintiff's background was mostly clerical-typing, involving routine, ministerial duties; that she had less work experience in Medical Administrative Services and no prior administrative experi-

ence. Mr. Appignani also testified that Ms. Weigand concurred fully in his evaluation of the candidates. Inexplicably however, Ms. Weigand did not testify in the trial.

The selecting officials, under the regulations, could have selected anyone among the eight persons referred to them by Personnel Services, and they did not have to select anyone based solely on the highest rating or test score. It is therefore clear that the articulated reasons, if accepted by the trier of fact, are sufficient to rebut plaintiff's prima facie case. A prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissable factors." *Texas Dept. of Community Affairs*, 450 U.S. at 254, 101 S.Ct. at 1094 (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

Plaintiff contends that the reasons given by defendant are not the real reasons and are merely pretextual. This she may prove either directly by persuading the fact finder that a discriminatory reason more likely motivated the selecting officials or indirectly by showing that the proffered explanation is unworthy of belief. *Texas Dept. of Community Affairs*, 450 U.S. at 256, 101 S.Ct. at 1095.

Mr. Appignani relies upon the personal interview as the primary reason for selecting Mr. Menzen over the others. There are serious difficulties with that explanation. The interviewers had no set formula or procedure for conducting the interviews. No questions were committed to writing. If any notes were taken they were destroyed. Informal interviews may indeed prove more revealing and helpful in deciding whom to select for a job, but the ultimate decision thereby becomes more subjective and thus more subject to doubt.

One is left with the strong suspicion that the entire interview process was little more than window dressing. Plaintiff's originally scheduled interview was postponed until a few days before the selection was made. Moreover, so far as can be ascertained

from the evidence produced at the trial, plaintiff was not questioned about certain disciplinary items that were apparently incorrectly contained in her file and upon which the selecting official seem to have considered. The interviewing officials had the impressions that plaintiff was defensive and not very communicative. Considering that she had expressed concern to them that she had heard the person to be selected would be from Medical Administrative Services and she was then employed in Prosthetic Services, this is not surprising.

Purely on the basis of the employment records alone it cannot be concluded that either applicant was clearly more qualified than the other for the job. Plaintiff testified that during the period that she was a correspondence clerk she frequently worked night-time or weekend shifts and that she worked closely with MAA's on those shifts and on occasions would take over the duties of the MAA for brief periods of time during a shift. Although Mr. Appignani acknowledged that plaintiff had told him this before the selection of Mr. Menzen was made, he dismissed it because he could not substantiate this from the record. Certainly, if truly interested in obtaining the best qualified person for the job, one would have expected some further inquiry by the VAMC staff to ascertain whether or not plaintiff did have such knowledge and experience about the job. If she had, as she testified, it would appear that her direct work experience knowledge about the job would exceed that of Mr. Menzen.

Plaintiff submitted with her application an Employee Supplemental Qualifications Statement detailing to some extent her prior work experiences. Mr. Menzen did not submit such a statement. Although submission of such a statement is not mandatory, the form itself states that it is a primary source document for rating and ranking purposes, and that failure to furnish the information may make it impossible to determine qualifications. One would ordinarily expect that if there was a true competition for the job, the selecting officials would at least give some consideration to the fact that a candidate had not submitted the form, and a fuller explanation as to why it was deemed of no value in determining whom to select.

Plaintiff's last performance appraisal rated her as "highly satisfactory"; whereas Mr. Menzen's rating was a lower "fully satisfactory." Admittedly, different supervisors, (the same as different teachers), may be more sparing than others in awarding high grades. The significance of this evidence is that neither Mr. Appignani nor Ms. Weigand appear to have even considered this difference in job ratings.

It seems clear that defendant relied almost entirely upon the subjective impressions of the selecting officials as a result of the personal interviews to justify the selection of Mr. Menzen. This of course would not be prohibited by the statute. However, when an evaluation such as this is based on subjective impressions and the evaluators are not themselves of the protected class, "the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny." *Page v. Bolger*, 645 F.2d 227, 230 (4th Cir.1981), (en banc), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

Mr. Appignani testified that the determination to select Mr. Menzen was not even close after the interview, because Mr. Menzen's interview was "remarkable." He also testified that had not Mr. Menzen been selected, he still would not have selected plaintiff because there were other candidates whom he considered to be better qualified.

Plaintiff has the overall burden of proving by a preponderance of the evidence that defendant intentionally discriminated against her. Because defendant has articulated legitimate nondiscriminatory reasons for selecting Mr. Menzen in preference to plaintiff, plaintiff may no longer rely solely on her prima facie case. I conclude that on the whole record the reasons and explanation given by the defendant are not the real reasons. Ordinarily this would be sufficient to establish that the reasons given were pretextual to cover up the illegal dis-

criminatory intent. However, there may be other reasons than those provided that are nonetheless not unlawful. That presents a problem in this case.

Mr. Menzen may have been selected because (1) he was personally friendly with and liked by Mr. Appignani who could have selected him over any other candidate irrespective of qualifications and without regard to whether he was the best qualified or (2) the selecting officers had decided to select someone from Medical Administrative Services but did not want to publically so state. If either of these, and perhaps other reasons were the real reasons, plaintiff would not have been the victim of unlawful discrimination.

The statistical evidence as to promotion and hiring practices within VAMC and in particular in the Medical Administrative Services is insufficient to establish any pattern of race or sex discrimination. Not surprisingly, a rather high percentage of black females hold jobs and have been hired and promoted at the Veterans Administration Medical Center in Philadelphia. Mr. Appignani, as Chief of the Medical Administrative Services cannot be shown by statistics to be in any way biased on account of race or sex in his selections for job positions. There is nevertheless, an unproven, but rather substantial feeling or impression among blacks and females, and especially among blacks, that the higher paying, higher rated supervisory positions obtained by promotion do not go in a fair proportion to such minorities. The evidence is insufficient to make any finding of any generalized discrimination or discriminatory intent in promotions to supervisory positions.

The job of Medical Advisory Assistant is defined as a "career ladder position." The responsibilities are substantial. The MAA acts in place of the Chief and Assistant Chief of Medical Administrative Services when neither is available, primarily during night and weekend tours of duty. Thus, the job requires supervisory skills.

Elizabeth Hawkins, an MAA since 1987, testified that she knew plaintiff and had been her supervisor for about one year around 1978 or 1979. Ms. Hawkins opined that plaintiff always did a thorough job and would have made a fine MAA. Ms. Hawkins also testified that she knew Michael Menzen for many years and had worked with him and that he would, "after training" be satisfactory as an MAA. I accept her testimony as credible and accurate. Her testimony strongly corroborates plaintiff's contentions and lends strong support to the probable racially discriminatory intent of the officials who selected Mr. Menzen.

Although Mr. Appignani and Ms. Weigand jointly conducted the interviews, the actual selection clearly appears to have been made by Mr. Appignani. Ms. Weigand in reality merely concurred. I am convinced that Mr. Appignani sincerely believes that he selected Mr. Menzen because he was, in Mr. Appignani's opinion, the best applicant for the job. This however does not preclude a finding that he intentionally discriminated against Carolyn Bennett because of her race or sex. If race and/or sex was a determinative factor, whether consciously or unconsciously employed, then it would be a violation. The injury to plaintiff would be the same.

Intent may be ascertained by a fact finder by direct or circumstantial evidence. Although I find insufficient evidence of discrimination on account of plaintiff being a female, I conclude that plaintiff has established by a preponderance of the evidence that race was a determinative factor in the selection of Mr. Menzen over Carolyn Bennett, the plaintiff. This is based primarily on my conclusion that the explanations given for the selection of Mr. Menzen were not the real or true reasons, and that although there are, as previously noted, other possible or speculative reasons that would not violate the law, the most likely and probable reason was because plaintiff was black and Mr. Menzen was white. This is sufficient to prove plaintiff's claim by a preponderance of the evidence.

■ Having determined that plaintiff was the victim of unlawful race discrimination the appropriate remedy appears fairly clear. She should, in legal jargon, "be

made whole." The government argues that in her present job category she cannot be given a rating of GS–6, which is the rating she apparently would have had by now, but for the racial discrimination. Assuming that this may be a correct interpretation of law, she is nevertheless entitled to back-pay and seniority rights and other benefits retroactive to March 29, 1987 until such time as she is promoted to the MAA position. There are five or six MAA positions currently at VAMC. Undoubtedly there will be a vacancy in the relatively near future. If not, it is conceivable that the Court will direct that VAMC create an additional MAA position. A judgment to carry out these remedies will be entered.

Neither party ordered a copy of the transcript of the trial record, despite my request that such be done. Consequently this decision, and the findings of fact and conclusions of law are based upon my review of my trial notes and examination of the trial exhibits.

To the extent that the "Discussion" portion of this decision contains findings of fact and/or conclusions of law in addition to those expressly set forth under such headings, they shall be deemed to be a part of the respective findings of fact and conclusions of law.

### ORDER

For the reasons stated in the foregoing Findings of Fact, Conclusions of Law and Discussion, it is ordered as follows:

1. Judgment is entered in favor of the plaintiff and against the defendant, Veterans Administration.

2. Defendant shall pay to plaintiff all additional wages and provide to plaintiff all seniority and benefits retroactive to March 29, 1987 that she would have received and obtained from time to time from March 29, 1987 had she been promoted to and selected for the position of Medical Administrative Assistant as of March 29, 1987.

3. Defendant shall promote plaintiff to the position of Medical Administrative Assistant at the Veterans Administration Medical Center in Philadelphia, Pennsylvania with all the pay, seniority and benefits to which she would be entitled had she been promoted as of March 29, 1987. Said promotion shall be made upon the occurrence of the next vacancy or opening for a Medical Administrative Assistant at the Veterans Administrative Medical Center in Philadelphia, Pennsylvania.

4. Plaintiff shall receive the costs of suit and a reasonable attorney's fee. If the parties are unable to agree as to the amount of fees and costs, plaintiff may file a petition for an award of fees and costs. December 28, 1988.